# IN THE COURT OF APPEALS OF IOWA

No. 20-0061
Filed January 21, 2021

**IN RE THE MARRIAGE OF DARLA YAVONNE LORENZ
AND PAUL PHILIPS LORENZ, JR.**

**Upon the Petition of
DARLA YAVONNE LORENZ,**
        Petitioner-Appellee,

**And Concerning
PAUL PHILIPS LORENZ, JR.,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Union County, Dustria A. Relph,

Judge.


        A former husband appeals the economic aspects of the decree dissolving

his long marriage.  **AFFIRMED.**


        Andrew B. Howie and Tara L. Hofbauer of Shindler, Anderson, Goplerud &

Weese, P.C., West Des Moines, for appellant.

        Cole J. Mayer of Macro & Kozlowski, LLP, West Des Moines, for appellee.


        Considered by Doyle, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Paul and Darla Lorenz divorced after being married for twenty-four years. Paul now challenges the spousal support and property division in the decree dissolving their marriage. Darla defends the decree and seeks appellate attorney fees. Finding the spousal-support award and asset distribution were both fair, given the length of the marriage and the spouses' respective contributions, we affirm. Because she successfully defended the decree on appeal, we award the attorney fees requested by Darla.

## I.    Facts and Prior Proceedings

Paul and Darla married in 1995. Paul used his degree in economics and finance to pursue a career as a loan officer.[1] Darla had a high school diploma and about eighteen hours of credit from the American Institute of Business. Early in the marriage, she worked full time as a bookkeeper.

Three years after their wedding, Paul and Darla had a son, P.L. The couple agreed Darla would stay at home with P.L. in his "beginning years." When P.L. experienced developmental delays, Darla decided not to rejoin the workforce so she could "help him get through things." In elementary school, P.L. was diagnosed on the autism spectrum. Darla devoted much of her time lining up services for P.L.'s special needs.[2] Because of Darla's investment of time and energy, P.L.

---

[1] At the time of trial, Paul earned $65,040 in wages, with a total compensation and benefits package of $83,116 from PCSB Bank. In 2015, Paul left his job at First National Bank and took the position at PCSB for a "substantially lower salary."
[2] During P.L.'s school years, Darla did hold several part-time jobs but never earned more than $15,000 per year.

earned high grades in high school. By trial, P.L. was twenty-one years old and attending community college. He lived with Darla in an apartment.

Paul had a different take on Darla's decision not to work outside the home. He insisted, "It was my impression that we weren't going down to a one-income situation after my son was going to school." Paul contended the financial pressure pushed him to moonlight by marketing college football tickets online. He testified: "[T]hat's why I felt like the supplemental income from selling tickets on a small degree was actually helping the family a little bit because I couldn't count on whatever she was going to possibly do for income."

That ticket-selling venture was a sore point during the marriage. The district court described Paul's scheme:

> Though Darla was aware that Paul had been selling tickets since 2008, she appeared to have very little knowledge of the extent of the business until she discovered in 2018 that Paul had accumulated $75,000 in credit card debt related to purchasing tickets. Darla was extremely upset when she became aware of the credit card debt and insisted that Paul pay it off. Paul unilaterally decided to withdraw $90,000 from the 401(k) that he accumulated entirely during the marriage in February 2019. $75,000 of that went to pay off the credit card debt. Paul testified that the remaining $15,000 was to be set aside for tax consequences related to the withdrawal.

That same month, Darla petitioned to dissolve the marriage. At the time of the October trial, Paul was fifty-four and Darla was fifty-seven years old. Paul had some minor medical issues, including high blood pressure, high cholesterol, and gout. Darla was in good health. Since the parties separated, Darla secured a full-time office job for the local school district for thirteen dollars per hour, but she resigned because she found the working conditions stressful. At the time of trial, she was working twenty hours per week at ten dollars per hour for a grocery store.

In the decree dissolving the marriage, the district court set the stage for its decisions on spousal support and property distribution:

> Regardless of why or who did or did not agree to it, Darla was never employed on a full-time basis for over 21 years between 1998 and 2019. However, she did work several part-time jobs, maintained the family home, and was the primary caregiver for [P.L.], who has special needs. At trial, Paul seemed to minimize the value of Darla's non-financial contributions to the family.

The court also made these explicit credibility findings: "Paul's testimony concerning his ticket sales business was evasive, and the court has difficulty finding it completely truthful." And "the court finds [Darla's] testimony that she provided the majority of the extraordinary care required for [P.L] and the maintenance of the home more credible than Paul's testimony to the contrary."

> On spousal support, the court determined:

> Paul should pay to Darla as permanent traditional alimony the sum of $1,000 per month until Paul begins receiving Social Security retirement benefits. At that time Paul's alimony will be reduced to $750 per month until the death of either party or Darla's remarriage, whichever shall first occur, or until further order of the court.

> On the division of property, the court awarded Paul the marital home. As

for the home, the court ordered:

> Upon closing on either the mortgage refinance or the sale of the above described property, whichever shall first occur, Paul shall pay to Darla as her portion of the equity in the marital home 50% difference of $109,260 minus the then existing balance of the U.S. Bank mortgage *and* minus $12,700 which is awarded to Darla as her premarital property.

> Pertinent to the issues on appeal, the court awarded Darla and Paul each

half of Paul's "Raymond James IRA accounts after subtracting his premarital contribution of $10,759." The court awarded Darla all of her "small IPERS account." The court also held Paul solely responsible for "all penalties, taxes

and/or other fees associated with the early retirement withdrawal in the tax year 2019." Paul now appeals.

## II. Scope and Standards of Review

We review cases tried in equity de novo. Iowa R. App. P. 6.907. We accord weight to the district court's factual determinations, but they do not bind our resolution. *In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020). Within the legal framework of Iowa Code section 598.21A (2019), the award of spousal support is discretionary. *Id.* at 20. And we grant the district court "considerable latitude" in fashioning an award. *Id.* Plus, in reviewing the spousal support award, "we recognize that the district court has had an opportunity to evaluate the testimony of witnesses. *Id.* As for the property distribution, we look for a division that achieves equity between the parties, which is not always the same as exact parity. *See In re Marriage of Hansen*, 886 N.W.2d 868, 871 (Iowa Ct. App. 2016).

## III. Analysis

## A. Spousal Support

Citing their long marriage and her two decades away from full-time employment, Darla sought $1500 per month in traditional spousal support. Paul testified he should not have to pay any support. The district court ordered Paul to pay $1000 per month and reasoned:

> This alimony award takes into consideration the realistic earning capacities of each of the parties, the 24 year length of the marriage, the unlikelihood that Darla will be able to independently achieve the marital standard of living without an award of alimony, Paul's ability to maintain his standard of living, and the division of property herein.

On appeal, Paul asserts (1) he lacks enough income to pay the ordered amount, and (2) Darla does not need the support. We disagree on both counts.

Like the district court, we find these circumstances warrant traditional spousal support.

Our analysis focuses on the relevant factors in section 598.21A.[3]  Without question, the Lorenz's marriage crossed the "durational threshold" meriting "serious consideration for traditional spousal support."  *See In re Marriage of Gust*, 858 N.W.2d 402, 410–11 (Iowa 2015) (setting twenty years as tipping point). Despite Paul's current laments about Darla's decision to stay at home, their marriage followed the traditional "life pattern" of one spouse as the primary wage earner, and the other spouse focusing on child rearing and domestic tasks.  That demarcation left Darla with an economic disadvantage in the workplace.  *See id.* at 410.  The district court thoroughly examined the parties' expenses and earning

---

[3] These factors include:
> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> ....
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).

capacities. From that examination, the court determined Darla would be unable to support herself at the same standard of living enjoyed during the marriage.

While the parties did not lead a "lavish lifestyle," they did take "some big trips," according to Darla's testimony. And they owned a comfortable three-bedroom, two-story house. Darla testified she did not plan to stay in her small apartment and would need support to afford a bigger place, as well as a more reliable vehicle. The district court expected that Darla could earn about $15,080 per year at full-time, minimum wage employment. By contrast, Paul was earning more than $65,000. Given this disparity, the award of spousal support was equitable.[4] *See Mann*, 943 N.W.2d at 21 (citing *Gust*, 858 N.W.2d at 411–12 for the proposition that "marked disparity of income is a relevant factor in considering the question of an award of alimony").

## B. Property Division

Paul raises four complaints about the property division. First, he contends the district court should not have set aside $12,700 to Darla as a premarital asset used as a down payment on the marital home. Second, he argues the court should have set aside $102,746.72 of his retirement account as premarital property. Third, Paul asserts he is entitled to a portion of Darla's IPERS account. And fourth, Paul contests the order that he pay all taxes and penalties from the early withdrawal of his IRA. We will address each argument in turn.

---

[4] In his reply brief, Paul cites *Mann*, arguing, "In light of the federal tax law changes, the award in this case is in error." We do not consider arguments raised for the first time in a reply brief. *See Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992). Although the Supreme Court did not decide *Mann* until May 2020, the tax argument was available to Paul when he filed his opening brief.

Paul's first two complaints invoke the question of premarital property. Courts must consider the property parties brought into the marriage when equitably dividing the marital estate. Iowa Code § 598.21(5)(b). "[T]his factor may justify a full credit, but does not require it." *In re Marriage of Miller*, 552 N.W.2d 460, 465 (Iowa Ct. App. 1996) (noting premarital asset's impact on overall distribution will vary depending on circumstances).

### 1. Down Payment on Marital Home as Premarital Asset

Darla testified that the $12,700 down payment for the couple's home originated from the sale of her previous home. Paul recalled the down payment was a gift to both of them from Darla's parents. But he also acknowledged it was possible that the proceeds from the sale of Darla's house rolled over into their purchase of the marital home. The district court credited Darla's testimony and set aside the $12,700 down payment as a premarital asset.

On appeal, Paul highlights the ambiguity and attacks Darla's testimony as uncorroborated. But we defer to the district court's credibility finding that Darla was competent to testify to the transaction at issue. *See In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007). We thus decline to modify this aspect of the decree.

### 2. Retirement Savings as Premarital Asset

Paul next contends the court should have set aside $102,746.72 in his Raymond James retirement account as his separate property. The district court explained the disputed asset:

> At the time of trial, Paul's Raymond James retirement account had a value of $425,616.52, consisting of commingled marital and premarital funds. Paul pooled an older 401k he had from

employment prior to his marriage into his current Raymond James account in August 2018. [Financial advisor] Greg Driskell testified that the value of the funds when they were moved to Raymond James in January 1995 was $10,759.00. When the funds were combined in 2018, Paul's premarital 401(k) was valued at $102,746.72

In its conclusions of law, the court set aside the original $10,759 investment for Paul but divided the remainder between the parties. The court justified splitting the appreciation of the retirement funds because "both parties contributed to the marriage in a variety of ways." *See In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007) (discouraging elevation of financial matters over other contributions to the marriage).

On appeal, Paul contests the division because Darla offered no evidence to show how she contributed toward the appreciation of the retirement funds. But, as the district court noted, Darla provided "extraordinary care" for P.L. during the marriage. And the court underscored Paul's "unilateral decision to pay his ticket business debt with his 401(k) that accumulated during the marriage."

Contrary to Paul's contentions, the decree achieved an equitable distribution of the premarital and marital assets. Darla made important contributions to the marriage, which Paul fails to fully appreciate as they part ways. We thus decline to modify the distribution of the funds in this retirement account.

### 3. Darla's IPERS account

Paul also challenges the district court's treatment of Darla's IPERS account. A trial exhibit showed her contributions to that account were $7731.20. She contributed to that retirement account while working part-time for a public health agency during the marriage. The court awarded Darla the entire value of the

account. Paul insists the court should have divided Darla's IPERS account "per the *Benson* formula." *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996).

Paul is correct that the IPERS account, as a pension, is subject to division as marital property. *See id.* But the fact that a pension is "includable in the total assets subject to award or division" does not mean that the court cannot award the entire account to one party in equitably dividing all the assets. See *In re Marriage of Branstetter*, 508 N.W.2d 638, 640 (Iowa 1993). Paul disputes the equity of this award in isolation. But we must evaluate the fairness of the property division as a whole, not piecemeal. With no argument that it was inequitable to assign the IPERS account to Darla in the entire distribution scheme, we refuse to modify the award.

### 4. Taxes and Penalties from Early Withdrawal

Paul's final claim involves his ticket-sale enterprise. The district court assigned "100% of any and all penalties, taxes and/or other fees associated with the early retirement withdrawal in the tax year 2019" to Paul. The court explained that assignment was "in consideration of the award of 100% of the PCSB savings accounts, 100% of Walmart stock shares, 100% of the StubHub and PayPal accounts (the value of which were undisclosed), and 100% of the credit card points and rewards to Paul (also the value of which were undisclosed)."

On appeal, Paul asserts that Darla "pressured" him to pay down $75,000 in joint credit card debt, so he withdrew $90,000 from his IRA. Because Darla did not object to eliminating the debt, he contends she should share in the penalties and taxes incurred in the withdrawal.

Like the district court, we reject Paul's contention. His logic is flawed because he skips to the last chapter: his unilateral effort to cover the credit card balance. The rest of the story involves his effort to hide the extent of his ticket-sale debt from Darla. And he remained less than forthcoming about his side business at trial. The district court found his testimony about the ticket-sale finances to be "evasive." The court did not believe Paul was being "completely truthful" when he testified that "it was hard to say how much profit he made." The court noted in all other aspects he was "extremely particular about his personal finances." We defer to this credibility determination for two reasons. First, the district court had a ringside seat for the trial testimony. *See In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007). Second, Paul's deception is evident from the contrast between the financial precision he demonstrated in his banking career and his lack of documentation for the tens of thousands of dollars in ticket sales. On this record, we agree that Paul should bear the costs of his chosen method to cover the debts he incurred in the ticket-sale scheme.

### C.    Appellate Attorney Fees

Darla asks for $2,800 in appellate attorney fees. In deciding whether to award them, we consider Darla's needs, Paul's ability pay, and whether Darla had to defend the decree on appeal. *See In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). For the same reasons that we uphold the spousal support and property distribution, we find equity warrants an award of appellate attorney fees to Darla in the requested amount. We also assess costs of the appeal to Paul.

**AFFIRMED.**